# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>621 E. 99TH STREET, UNIT 4<br>INGLEWOOD, CALIFORNIA 90301 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.  2:21-MJ-03481 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1344 and 1956,<br>21 U.S.C. §§  841 and 846. | See affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Lyndon Versoza
_____
*Applicant's  signature*

Postal Inspector Lyndon Versoza
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's  signature*

City and state: <u>Los Angeles, CA</u>

Hon. Pedro V. Castillo, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

**ATTACHMENT A**

**PREMISES TO BE SEARCHED**

The premises to be searched is:

621 E 99TH STREET, UNIT 4, INGLEWOOD, CALIFORNIA 90301 (the ROBERTS PREMISES).  The ROBERTS PREMISES consists of an apartment and a private garage in a complex located on the north side of East 99th Street, between South Flower Street and South Prairie Avenue.  The complex has two levels of apartments over a shared parking level.  The building has beige colored stucco walls and a brown framed glass entry way.  To the left of the entry way is a brown cement block patterned design.  Above the entry way are the numbers "621."  The apartment door to ROBERTS PREMISES is located on the first floor and is white in color. Affixed to the door is the number "4."  Behind the building, in the alleyway, north of East 99th Street and south of East 97th Street, are eight, white colored, private garage doors which are separate from the shared parking.  The garage doors at both ends of the property fit a single car, while the six garage doors in between fit two cars.  The private garage that is part of the ROBERTS PREMISES is the one furthest east, and has a door wide enough for a single car.  The premises to be searched includes UNIT 4, its private garage, and any storage lockers assigned to UNIT 4.

**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1344 (bank fraud) and 1956 (money laundering) and 21 U.S.C. §§ 841 and 846 (drug trafficking) (the "Target Offenses"), namely:

a.   Controlled substances, precursor chemicals, and related items and paraphernalia such as cutting and packaging material, scales, pay-owe sheets, and documents and records referring or relating to the same, including those that are opaque as to units (e.g., "I need ten right now").

b.   Firearms and related items such as ammunition and holsters, money counters, and documents referring or relating to the same;

c.   Documents and records referring or relating to law enforcement or bank investigations, accounts being frozen or closed or at risk of the same, currency transaction reports, and manipulating transaction amounts to avoid scrutiny;

d.   Records, programs, and items relating to the counterfeiting or manipulation of documents and identifications, such as the cutting-and-pasting of signatures, letterheads, watermarks, and seals, including the altered or counterfeited information itself.

e.   Documents and records referring or relating to cash transactions totaling over $10,000 or the purchase of more than $3,000 of postal money orders in a two-week period, or conducting multiple cash ATM transactions or purchasing multiple postal money orders on the same day;

f.   Documents and records referring or relating to having one person conduct financial transactions on behalf of a different person, or which purport to show a person-to-person loan or payment on such a loan of at least $1,000;

g.   Mail matter and shipping packages, opened or unopened, not addressed to or from 621 E. 99TH STREET, UNIT 4, INGLEWOOD;

h.   Personal identifying information of individuals other than those residing at 621 E. 99TH STREET, UNIT 4, INGLEWOOD, including social security numbers, other identifying numbers, dates of birth, credit, debit card, or other account information, PINs, credit reports, and bank or other financial institution information, and records referring or relating to such information;

i.   Records relating to wealth and the movement of wealth since 2016, such as tax returns and forms, crypto-currency accounts and transfers, other digital wealth storage and transfer methods including PayPal and Venmo, money orders, brokerage and financial institution statements, wire transfers, currency exchanges, deposit slips, cashier's checks, transactions involving prepaid cards, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, real estate mortgage initial purchase loans or loan refinances, residential property leases, escrow accounts, the purchase, sale, or leasing of automobiles or real estate, or auto loans, and investments, or showing or referring to purchases or transactions for more than $1,000;

j.   Records or items containing indicia of occupancy, residency or ownership of any location or vehicle being searched, such as keys, rental agreements, leases, utility bills, identity documents, cancelled mail, and surveillance video;

k.     Currency, money orders, and casino chips with a value in excess of $1,000, including the first $1,000 if more than $1,000 is found, precious metal coins and bullion, Bitcoin and other digital currency as well as related documents and programs, and prepaid debit or credit cards;

l.     Documents and keys relating to public storage units, rental cars, prepaid cellular telephones, safety deposit boxes, Commercial Mail Receiving Agencies, virtual offices, or receiving mail at someone else's address, or holding or renting assets or items under someone else's name;

m.     Documents and records showing electronic and telephone contacts and numbers called or calling, such as SIM cards, address books, call histories, telephone bills, and ICQ, Telegram, and email addresses;

n.     Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the TARGET OFFENSES, and forensic copies thereof.

2.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.     evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.     evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan

3

horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.   records of or information about Internet Protocol addresses used by the device;

i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop,

notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**II.  SEARCH PROCEDURE FOR DIGITAL DEVICES**

5.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team will not search for similar evidence outside the scope of the items to be seized without first obtaining authority to do so.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

8.    During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumbs and/or fingers of IKE ROBERTS onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of that person with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in

Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant, and do not apply to any other search of digital devices.

## AFFIDAVIT

I, Lyndon A. Versoza, being duly sworn, hereby depose and state
as follows:

### I.   TRAINING AND EXPERIENCE

1.    I am a United States Postal Inspector employed by the
United States Postal Inspection Service ("USPIS"), Los Angeles
Division, in Los Angeles, California, where I have served since
June 2005.  Currently, I am responsible for investigating
criminal violations of money laundering and structuring laws,
such as when the services of the United States Postal Service
are employed by criminals as part of the means to launder or
conceal illicit funds, and/or avoid banking reporting
requirements.  I am also one of seven Postal Inspectors in the
U.S. currently designated by USPIS as a Subject Matter Expert
("SME") in money laundering investigations.  As a SME, I have
spoken at money laundering conferences and provided training to
the financial and banking industry and other law enforcement
agents. I have also received both formal and informal money
laundering training from USPIS and other government and private
agencies.  During my 16-year career as a Postal Inspector, I
have investigated: mail thieves, burglars, rapists, murderers,
armed robbers, prison and street gangs, drug trafficking
organizations, and perpetrators of financial violations

(including money launderers, darknet vendors, digital currency launderers, identity thieves and fraudsters).  For approximately five years prior to investigating money laundering, I was assigned to investigate child exploitation and sex trafficking. In that assignment, I worked both independently and in a task force where I led and participated in investigations related to crimes involving the exploitation of children and sex trafficking domestically and internationally.  In that capacity, I also earned a designation by USPIS as a SME in Child Exploitation Investigations.

2.    From 2002 to 2005, prior to my service as a US Postal Inspector, I served as a law enforcement officer with the US Immigration and Naturalization Service, which later became part of the US Department of Homeland Security.  In this capacity I enforced immigration and customs law at an international airport and seaport, and later, worked in an intelligence unit for local and national counter-terrorism and smuggling operations.

3.    I am familiar with the facts and circumstances described herein.  This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly.  This affidavit does not purport to set forth my complete knowledge or understanding of

the facts related to this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.  All figures, times, and calculations set forth herein are approximate.

## II. PURPOSE OF AFFIDAVIT: SEARCH AND RENEWED GPS WARRANTS

4.   This affidavit is made in support of an application for a warrant to search 621 E 99TH STREET, UNIT 4, INGLEWOOD, CALIFORNIA 90301 (hereinafter "ROBERTS PREMISES"), where IKE LAFAYETTE ROBERTS ("ROBERTS") resides, for violations of 18 U.S.C. §§ 1344 (bank fraud) and 1956 (money laundering) and 21 U.S.C. §§ 841 and 846 (drug trafficking) (the "Target Offenses").

5.   This affidavit is also made in support of an application to renew the warrant authorizing the disclosure of cell-site and GPS information, as well as the use of a cell-site simulator, also known as a "Stingray," as defined or discussed within the application, at such intervals and times as the government may request, and the furnishing of all information, facilities, and technical assistance necessary to accomplish said disclosure unobtrusively, which disclosure will establish the approximate location of the following cellular telephones for a period of 45 days:

a.   213-909-4372, a cellular telephone issued by

T-Mobile and used by IKE LAFAYETTE ROBERTS ("ROBERTS"),
(hereinafter "SUBJECT TELEPHONE").

6.    I also seek authorization under 18 U.S.C. § 3103a(b),
for reasonable cause shown below, to delay notification of the
proposed GPS/Stingray order (not the search warrant) for a
period of 30 days from the date that the disclosure ends.

7.    As described more fully below, I respectfully submit
there is probable cause to believe that cell-site information,
GPS information, and information from a cell-site simulator,
likely to be received concerning the approximate location of the
SUBJECT TELEPHONE will constitute or yield evidence of the
location of IKE LAFAYETTE ROBERTS and his conspirators (the
"TARGET SUBJECTS") who are the subject of an investigation
regarding the Target Offenses.

### New Developments Since the First Search and GPS Warrants

8.    On May 25, 2021, the Honorable United States
Magistrate Judge Jacqueline Chooljian authorized a warrant for
the cell-site information, GPS information, and information from
a cell-site simulator on the SUBJECT TELEPHONE used by ROBERTS.
This warrant expired on July 9, 2021. Judge Chooljian also
authorized a warrant to search a safety deposit box belonging to
ROBERTS. Inside ROBERTS' box was $341,000 in cash and paperwork.
This cash was placed in front of a certified drug K9 who alerted
to odors of drugs. Since the authorization of his warrants, the

- 4 -

following has occurred:

      a.    On June 10, 2021, law enforcement officers conducted surveillance on ROBERTS and confirmed he lived at the ROBERTS PREMISES.  I also confirmed through DMV records that ROBERTS resides at the ROBERTS PREMISES.

### III. __PROBABLE CAUSE STATMENT__

9.    From my role as a case agent in the investigation as well as from speaking with the case agents from the Federal Bureau of Investigation ("FBI") and Drug Enforcement Administration ("DEA") and reading their reports, I know that U.S. Private Vaults is a business in a strip mall that rents safety deposit boxes anonymously. It is owned and managed by criminals who engage in money laundering, drug trafficking, and structuring, among other offenses. Its business model is designed to appeal to criminals for customers. It charges many times what banks do for similar safety deposit box rentals, but staff conduct countersurveillance for customers, alert them to law enforcement investigations, and structure transactions for them to avoid filing currency reports--in addition to providing them a place to store criminal proceeds anonymously. USPV also launders for its customers cash that is purported to be drug proceeds by converting it into precious metals or wire transfers. The great majority of USPV customers pay cash to rent their safety deposit boxes, at least some of which USPV then deposits into their own

bank account, which it uses to pay its operating expenses. By using its customers' criminal proceeds to maintain its own anonymous facility for the storage of criminal proceeds, USPV engages in money laundering.

10.   I know from reading the indictment that on March 9, 2021, USPV was indicted by a federal grand jury for conspiring with its customers and others to launder money, distribute drugs, and structure financial transactions to avoid currency reporting requirements.  A copy of that indictment is attached and incorporated.

11.   Beginning on March 22 through March 26, 2021, I, along with agents from USPIS, FBI and DEA executed federal search and seizure warrants at USPV which authorized, among other things, seizing the nests of safety deposit boxes at USPV as evidence and instrumentalities of the offenses committed by USPV.  The warrants did not authorize criminal searches of the contents of the individual boxes but specified that agents would conduct an inventory of the contents in accordance with their written procedures, and were authorized to look for contact information in those individual boxes in order to notify the boxholders of the seizure so that they could seek the return of their property. An inventory search was conducted on all the boxes at USPV, including BOX 5512.

A.   <u>ROBERTS Confirms the SUBJECT TELEPHONE Belongs to Him.</u>

12.   On March 22, 2021, while the warrant on USPV was being executed, ROBERTS showed up to assert a claim to his box. FBI Special Agent Forrest Hogue and SA Spencer Kim spoke with ROBERTS.  ROBERTS provided agents with the SUBJECT TELEPHONE number. Roberts also stated that he had approximately $300,000 USD in USPV box 5512.  I also learned from Postal Inspector Noah Thompson that ROBERTS arrived at the search site with Stanley Hudson (a convicted identity thief) and Michael Magee (a convicted drug dealer and fraudster).  ROBERTS appeared to Inspector Thompson as extremely high on drugs.  All three individuals walked up to law enforcement officers guarding the perimeter of the search operation to inquire about their boxes. From reviewing an FBI claims spreadsheet, I learned that on March 27, 2021, ROBERTS submitted his name, email address and the SUBJECT TELEPHONE on an USPV claim form on the FBI's website.

13.   On May 19, 2021, I reviewed FBI documents that summarized the inventory of BOX 5512.  BOX 5512 had ROBERTS's information such as a copy of ROBERT's California driver license, which lists the ROBERTS PREMISES as his address, SUBJECT TELEPHONE number, as well as an alternate person to contact in Talahassee, Peletha Dahn.  It also had bundles of rubber banded and paperclipped cash totaling $341,500.

14.   On the morning of May 20, 2021, I called the SUBJECT

- 7 -

TELEPHONE.  A person who identified himself as IKE ROBERTS answered the phone.  ROBERTS asserted that BOX 5512 belonged to him.  I asked ROBERTS about the name "Peletha Dahn," which was found in BOX 5512, and ROBERTS stated that Dahn is his sister. ROBERTS restated that the BOX 5512 and its contents belong to him and she was just listed as an emergency contact for him. ROBERTS stated that he has one of the keys and his sister Dahn has the other key; however, only his retina and palm print (which I know was used by the business to allow customers access the vault area) would be registered with USPV.

15.  On May 20, 2021, I also spoke with Peletha Dahn on the phone.  Dahn confirmed that BOX 5512 belonged to her brother, ROBERTS.  She was just the "next of kin."  Dahn stated that she had a key to BOX 5512 but her biometrics are not registered with USPV.  Dahn stated that she has never been to USPV.

B.  Drug Detecting K9 Alerted to the Cash in BOX 5512

16.  On May 20, 2021, I read a declaration from Chino Police Officer, Brendan Rowland who handles a certified drug detecting K9, "Kobra," which I have attached and incorporated. From his declaration, I learned that on March 23, 2021, at approximately 01:30 am, while the search warrant for USPV was being executed, federal agents presented the cash from BOX 5512 to Kobra.  Officer Rowland said in his declaration that "Kobra alerted to the presence of the odor of illegal drugs emitting

from" Box Number 5512.

17.   I also spoke with Officer Rowland who told me that: Kobra has received 240 hours of basic training and receives continual training every week.  As part of her regular training and her yearly certification process, Kobra is subjected to a blind, controlled test in which different types of illegal drugs are hidden in different places in a large training facility. His handler does not know where the drugs are.  If Kobra alerts to an area that does not contain drugs, or fails to locate any of the drugs, she would fail and not be certified.

   C. ROBERTS has not paid state taxes since 2015 and does not report legal income to support the $341,000 cash found in his box.

18.   From reviewing public records, his own reporting at USPV, and records from the California Department of Motor Vehicles, I know that at least since 2015, ROBERTS has resided in California.

19.   From reviewing records from the California Franchise Tax Board, I know that:

      a.   ROBERTS has not filed state income tax since 2015. For the tax period of 2015, ROBERTS reported a federal adjusted gross income of about $28,500, $11,261 was taxable income.

      b.   ROBERTS was supposed to receive a $247 refund that tax year, however it was intercepted to pay debt he owed

the state of New York.

20.  I also reviewed ROBERTS' credit history and learned that ROBERTS has several accounts in collections for debts he has failed to pay.

D.  ROBERTS Committed Bank Fraud

21.  On May 20, 2021, I reviewed financial records from Wells Fargo Bank.  From this review I learned that in 2017, several counterfeit checks were deposited into a Wells Fargo bank account held by ROBERTS.  Some of the funds from the checks were withdrawn or spent before the bank discovered the checks were counterfeit.  When contacted, ROBERTS filed with the bank a claim for unauthorized ATM/Debit card transactions.  However, during the bank's investigation they found video of ROBERTS at an ATM withdrawing the cash.  The bank determined that ROBERTS was not a victim of the fraud.

E. ROBERTS resides at the ROBERTS PREMISES.

22.  On May 25, 2021, the Honorable United States Magistrate Judge Jacqueline Chooljian authorized a warrant for the cell-site information, GPS information, and information from a cell-site simulator on the SUBJECT TELEPHONE used by ROBERTS. Judge Chooljian also authorized a warrant to search a safety deposit box belonging to ROBERTS. Which as described above contained $341,000 in cash and paperwork. The paperwork contained a photocopy of ROBERTS' California Driver's license

- 10 -

which had the address of the ROBERTS PREMISES.

23.   On June 10, 2021, a law enforcement surveillance team followed the GPS coordinates of ROBERTS and found ROBERTS, who they recognized from his DMV photo, driving a Jaguar automobile around the South Bay of Los Angeles County.   The surveillance team followed ROBERTS until he drove into the first one of eight private garages for his apartment complex which are accessed from the alley behind the complex.   These private garages are separate from the shared parking for the complex.   The private garage ROBERTS used was the one furthest east.

24.   On July 16, 2021, I confirmed through DMV records that ROBERTS resides at the ROBERTS PREMISES.

F. Training and Experience in Bulk Cash

25.   Based on my training and experience, I know that it is extremely unusual to find $341,000 in cash in one place. Even successful and professional drug traffickers and money launderers rarely have so much cash, as it is inherently suspicious, and very difficult to spend; cash transactions of $10,000 or more generate currency transaction reporting requirements.   Having $341,000 in cash, which is an extremely large amount, and coupled with the canine alert, his bank fraud activity, his lack of income and his avoidance of taxes, indicates that ROBERTS is involved in criminal activity.

26.   Because large amounts of cash are difficult to spend,

heavy to carry, and easy to lose track of, as opposed to the
convenience of the banking system, I believe that it is highly
unusual for any large legal transactions to occur in cash.

27.   The average cost of yearly inflation of 3.1% would
mean that the storage is costing its owner over $10,500 per
year.

G. <u>Location Data Will Lead to Evidence</u>

28.   Based on my training and experience, electronic
location information on the SUBJECT TELEPHONE will be especially
important in this investigation.  Because ROBERTS went to the
trouble and expense of renting an anonymous safety deposit box
just to store his cash, which is not inherently illegal, in my
training and experience he is likely to be even more cautious
about distancing himself from contraband through the use of
stash locations that cannot be easily linked to him, and through
the use of countersurveillance techniques when meeting with co-
conspirators.  Prospective location information from the SUBJECT
TELEPHONE should provide investigators with ROBERTS's
approximate location so that we can identify his stash
locations, and co-conspirators, and verify that he is in his
residence before executing a search warrant there, which is
important to make sure that his smart phone will be found.  In
my training and experience, GPS information varies wildly in its
precision, ranging from tens or hundreds of meters of

imprecision at best, to over 10 kilometers of imprecision at worst.  In order to identify with confidence the particular apartment or building in which the SUBJECT TELEPHONE is, I will need the precision of a Stingray or cell-site simulator, discussed in more detail below.

H.   TECHNICAL BACKGROUND REGARDING CELL-SITE SIMULATORS

29.  Based on my training and experience and my conversations with other agents and investigators, I understand the following regarding cell-site simulators:

30.  Cell-site simulators, commonly referred to as a "Stingray," function by transmitting as a cell tower.  In response to the signals emitted by the simulator, cellular devices in the proximity of the device identify the simulator as the most attractive cell tower in the area and thus transmit signals to the simulator that identify the device in the same way that they would with a networked tower.

31.  A cell-site simulator receives and uses an industry standard unique identifying number (e.g., Electronic Serial Number (ESN), Mobile Equipment Identifier (MEID), International Mobile Subscriber Identity (IMSI), International Mobile Equipment Identity (IMEI), Mobile Station Identity (MSID), Mobile Directory Number (MDN) or the Universal Fleet Member Identity (UFMI)) that is assigned by a device manufacturer or cellular network provider. When used to locate a known cellular device, a cell-site simulator

initially receives the unique identifying number from multiple devices in the vicinity of the simulator.  Once the cell-site simulator identifies the specific cellular device for which it is looking, it will obtain the signaling information relating only to that particular phone.

32.  By transmitting as a cell tower, cell-site simulators acquire the unique identifying information from cellular devices. This identifying information is limited, however.  Cell-site simulators provide only the relative signal strength and general direction of a subject cellular telephone; they do not function as a GPS locator, as they do not obtain or download any location information from the device or its applications.  Moreover, cell-site simulators do not collect the contents of any communication. This includes any data contained on the phone itself:  the simulator does not remotely capture emails, texts, contact lists, images, or any other data from the phone.  In addition, cell-site simulators do not provide subscriber account information (for example, an account holder's name, address, or telephone number).

I. INTENDED USE OF THE CELL-SITE SIMULATOR AND DELETION OF NON-TARGET DATA

33.  Investigators intend to use the cell-site simulator to send signals to the **SUBJECT TELEPHONE** that will cause the **SUBJECT TELEPHONE,** and non-target cellular phones on the same provider network in close physical proximity, to emit unique identifying information, which the cell-site simulator will collect.

- 14 -

Investigators will then use the information collected by the cell-site simulator to determine the physical location of the **SUBJECT TELEPHONE.** Investigators plan to use the cell-site simulator to determine unique identifiers at multiple locations and/or multiple times at the same location.

34.   Although the cell-site simulator will collect the unique identifiers not only of the **SUBJECT TELEPHONE,** but also identifiers belonging to nearby non-target cellular telephones, these latter identifiers will not be used by law enforcement for investigative purposes, just as the extraneous incoming and outgoing telephone numbers necessarily recorded by conventional pen registers and trap-and-trace devices are not used for affirmative investigative purposes.  Absent further order of the court, law enforcement will make no investigative use of information concerning non-targeted cellular devices other than distinguishing the **SUBJECT TELEPHONE** from all other devices.   Once law enforcement has located the **SUBJECT TELEPHONE,** it will delete all information not associated with the **SUBJECT TELEPHONE.**

35.   The cell-site simulator may interrupt cellular service of cellular devices within its immediate vicinity.   Any service disruption will be brief and temporary, and all operations will attempt to limit the interference with cellular devices.

J.   GROUNDS FOR SEALING AND DELAYING NOTICE

36.   Based on my training and experience and my investigation

of this matter, I believe that reasonable cause exists to seal this application and the GPS/Stingray warrant, as well as the return to that warrant.  I also believe that reasonable cause exists to delay the service of that warrant as normally required for a period of 30 days beyond the end of the disclosure period pursuant to 18 U.S.C. § 3103a(b) and, pursuant to 18 U.S.C. § 2705(b), to enter an order commanding the Carrier not to notify any person, including the subscriber of the **SUBJECT TELEPHONE**, of the existence of that warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carrier complies with the warrant or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in (1) flight from prosecution; (2) destruction of evidence, or (2) otherwise seriously jeopardizing the investigation.

37. Furthermore, there is good cause for the GPS/Stingray warrant to be issued such that the information may be provided to law enforcement at any time of the day or night because in my training and experience, and knowledge of this investigation, the TARGET SUBJECTS do not confine their activities to daylight hours, and it is often even more difficult to conduct surveillance at night.

IV.   **CONCLUSION**

38.   For all of the above reasons, there is probable cause to believe that prospective cell-site information, GPS information, as well as information from a cell-site simulator, likely to be received concerning the approximate location of the **SUBJECT TELEPHONE**, currently within, or being monitored or investigated within, the Central District of California, will constitute or yield evidence of the location of IKE ROBERTS and aid in the investigation of him and his co-conspirators.

39.   Also for the reasons stated above, there is also probable cause to believe that evidence and proceeds of the Target Offenses, as described more particularly in Attachment B, are in the ROBERTS PREMISES.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _____ day of July, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

- 17 -

FILED
CLERK, U.S. DISTRICT COURT

03/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>U.S. PRIVATE VAULTS, INC.,<br>  California Corporate<br>  Number C3405297,<br><br>          Defendant. | CR 2:21-cr-00106-MCS<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1956(h): Conspiracy<br>to Launder Money; 21 U.S.C. § 846:<br>Conspiracy to Distribute<br>Controlled Substances; 18 U.S.C.<br>371: Conspiracy to Structure<br>Transactions; 18 U.S.C.<br>§ 982(a)(1), 21 U.S.C. §§ 853 and<br>881(a)(6), 28 U.S.C. § 2461(c) and<br>31 U.S.C. § 5317(c): Criminal<br>Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1956(h)]

A.   INTRODUCTORY ALLEGATIONS

1.   At times relevant to this Indictment:

a.   Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada Corporation registered with the California Secretary of State, was in the business of renting safety deposit boxes to individuals who wished to do so anonymously.

b.   Co-conspirator USPV Officer was an officer of USPV and

one of its owners.  USPV Officer dealt in marijuana, in violation of the laws of California, as well as cocaine.

c.   Co-conspirator USPV Manager was the manager of USPV. USPV Manager helped USPV Officer arrange drug deals within USPV, and helped USPV customers avoid detection by law enforcement, including by advising them to structure their cash purchases to avoid reporting requirements.

d.   Co-conspirator Gold Business was a dealer in precious metals and jewelry, and shared the same space as USPV, as well as some employees.  Gold Business helped USPV customers convert their cash into gold, and structured their cash transactions to avoid federal reporting requirements.

e.   Co-conspirator USPV Representative One was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative One instructed USPV customers how to structure transactions to avoid federal reporting requirements.

f.   Co-conspirator USPV Representative Two was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative Two instructed USPV customers how to structure transactions to avoid federal reporting requirements.

B.   THE OBJECTS OF THE CONSPIRACY

2.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant USPV conspired with others known and unknown to the Grand Jury to launder money, in violation of Title 18, United States Code, Section 1956, namely:

a.   to knowingly conduct and attempt to conduct financial transactions involving the proceeds of a specified unlawful activity,

2

that is, the distribution of controlled substances, with the intent to promote the carrying on of that specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

b.   to knowingly conduct and attempt to conduct financial transactions involving the proceeds of specified unlawful activity, that is, the distribution of controlled substances, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

c.   to knowingly conduct and attempt to conduct financial transactions involving the proceeds of specified unlawful activity, that is, the distribution of controlled substances, knowing that the transactions were designed in whole or in part to avoid a transaction reporting requirement under Federal law, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii).

C.   MANNER AND MEANS OF THE CONSPIRACY

3.   The objects of the conspiracy were carried out and were to be carried out, in substance, as follows:

a.   Defendant USPV would adopt business practices that attracted customers in possession of proceeds from criminal offenses, including drug trafficking, and not law-abiding persons.  Such practices included: (1) touting the anonymity of the safety deposit rentals that defendant USPV would provide, including by advertising "we don't even want to know your name"; (2) boasting that, unlike banks, its anonymous safety deposit box rentals did not require customer information that "can be easily accessed by government agencies (such as the IRS)"; (3) making arrangements for the payment

of the rental fees in cash and other ways that would be untraceable;
(4) issuing safety deposit box keys that were unmarked and unnumbered
so that law enforcement could not determine that the keys unlocked
safety deposit boxes at USPV; and (5) charging safety deposit box
rental rates several times higher than those at banks.

b.   USPV Officer would capitalize defendant USPV with the
proceeds of his illegal drug trafficking.

c.   USPV Officer would invite other drug traffickers who
knew and trusted him because of his illegal drug trafficking to store
the proceeds of their drug trafficking at defendant USPV.

d.   Employees of defendant USPV would conduct counter
surveillance of the neighborhood and warn customers when they
observed law enforcement.

e.   Agents of defendant USPV would instruct customers to
structure transactions to avoid currency transaction reports
including by purchasing gold and other precious metals through Gold
Business, which would structure transactions and not file required
currency reports.

f.   If agents of defendant USPV learned that law
enforcement was interested in searching or seizing the contents of a
particular customer's safety deposit box, they would attempt to warn
the customer, delay law enforcement, or even remove all but a nominal
amount of cash from the box for the customer, to prevent law
enforcement from discovering and seizing the bulk of the cash.

g.   Defendant USPV would deposit the cash proceeds it
received from its customers for safety deposit box rentals, which
included proceeds from the distribution of controlled substances,
into its bank account, and then use those proceeds to maintain USPV's

anonymous storage facilities for its criminal customers.

       h.   USPV Officer and USPV Manager would negotiate drug deals illegal under California law within the secured space of USPV, and USPV Officer would store the cash proceeds from drug deals within a safety deposit box at USPV.

       i.   USPV Manager would accept cash purportedly from illegal drug sales, and structure transfers of it to Gold Business in amounts not greater than $10,000 at a time in exchange for wire transfers that purported to be for the sale of precious metals.

COUNT TWO

[21 U.S.C. § 846]

4.    The Grand Jury realleges paragraph 1 of this Indictment here.

A.    OBJECTS OF THE CONSPIRACY

5.    Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

B.    MANNER AND MEANS OF THE CONSPIRACY

6.    The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.    OVERT ACTS

7.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1:  On June 28, 2019, USPV Manager distributed within USPV's business location six different butane hash oil vape cartridges containing THC to someone he believed to be a drug trafficker, but who was, in fact, a confidential informant working with law enforcement ("Confidential Informant 3"), as samples of what

defendant USPV could provide in bulk.

Overt Act No. 2: On July 26, 2019, USPV Officer met Confidential Informant 3 within USPV to sell him 1,000 vape cartridges containing THC.  USPV Officer delivered the cartridges in the parking lot of USPV, and received in exchange $8,000 in cash within USPV's business location.

Overt Act No. 3:  On or about December 11, 2019, during discussions for the sale of cocaine, USPV Officer instructed the buyer, Confidential Informant 3, to use a wireless communication application called "Signal," which is encrypted to communicate with him regarding the transaction.

Overt Act No. 4:  On or about December 16, 2019, USPV Officer instructed Confidential Informant 3 to come to USPV to complete the exchange.

Overt Act No. 5:  On or about December 16, 2019, USPV Manager called Confidential Informant 3 and explained that co-conspirator USPV Officer was not being careful enough, and could bring unwanted law enforcement attention to defendant USPV by conducting this drug deal onsite.

Overt Act No. 6:  On or about December 18, 2019, USPV Officer sold an ounce of cocaine to Confidential Informant 3 through intermediaries.

COUNT THREE

[18 U.S.C. § 371]

8.    The Grand Jury realleges paragraph 1 of this Indictment here.

A.    OBJECTS OF THE CONSPIRACY

9.    Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to knowingly and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the regulations promulgated thereunder: (1) cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and (2) structure, assist in structuring, and attempt to structure and assist in structuring, transactions with one or more nonfinancial trades or businesses, in violation of Title 31, United States Code, Section 5324(b)(3).

B.    MANNER AND MEANS OF THE CONSPIRACY

10.    The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.    OVERT ACTS

11.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but

8

not limited to the following:

Overt Act No. 1:  On December 4, 2019, Gold Business sold jewelry for $11,900 in cash to a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 1"), and did not file the required IRS Form 8300.

Overt Act No. 2:  On January 13, 2020, USPV Representative One told a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 4"), and who expressed an interest in buying $20,000 worth of precious metals in cash, to purchase only $10,000 at a time to avoid paperwork.

Overt Act No. 3:  On January 28, 2020, USPV Representative Two told a DEA agent who was posing as a USPV customer and said he wanted to purchase $18,000 in gold, "I recommend you stay under $10,000 in cash and then you could just do some one day, and a few days later you could do the other," and explained, "If you buy less than $10,000 then there's no form."

Overt Act No. 4:  On January 29, 2020, USPV Manager instructed Confidential Informant 3, who wanted to buy gold to pay a "skante" debt "down south," meaning a debt in Mexico for methamphetamine, to keep his purchases under $10,000 each:  "That way you don't have to give no social security, no ID. All that shit goes to the IRS."  USPV Manager introduced Confidential Informant 3 to co-conspirator USPV Representative One to purchase the gold.

Overt Act No. 5:  On January 29, 2020, USPV Representative One explained to Confidential Informant 3 and his friend, who was actually an undercover police officer ("Undercover Officer"), that it was better to space out his cash purchases and keep each one under

$10,000:  "Don't come in every day. . . . what they look for is a pattern of someone who with intention is trying to get around . . ."

Overt Act No. 6:  On January 29, 2020, when Undercover Officer explained that he needed more than $10,000 worth of gold quickly, USPV Manager suggested that he split the purchase between himself and Confidential Informant 3, so that each purchase would be under $10,000 individually.  USPV Representative One agreed to the ruse "as long as you hand me the money" separately and fill out receipts for two separate transactions.  USPV Representative One also agreed that Undercover Officer could pick up the total gold purchase alone the following day.

Overt Act No. 7:  On January 29, 2020, USPV Representative One accepted first $9,900 in cash from Undercover Officer and then another $5,000 which Undercover Officer handed to Confidential Informant 3, who then handed it to USPV Representative One.

Overt Act No. 8:  On January 30, 2020, USPV Representative One delivered nine ounces of gold bullion to Undercover Officer.

Overt Act No. 9:  On November 17, 2020, USPV Manager accepted $25,000 in cash from Confidential Informant 3, who said it was from the sale of "skante" (methamphetamine), and structured the transfer of it to Gold Business in exchange for wire transfers of $10,000 and $12,000, purportedly from the sale of gold, to launder the cash.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

a.   The business computers;

b.   The money counters;

c.   The nests of safety deposit boxes and keys;

d.   The digital and video surveillance and security equipment; and

e.   The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b),

11

defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

and 21 U.S.C. § 853]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 881(a)(6), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853, in the event of defendant USPV's conviction under Count Two of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal:

i.   constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; or

ii.   used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

///

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on one or more of the grounds set forth in paragraph 2 above:

       a.    The business computers;

       b.    The money counters;

       c.    The nests of safety deposit boxes and keys;

       d.    The digital and video surveillance and security equipment; and

       e.    The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), in the event of defendant USPV's conviction under Count Three of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

    a.   All right, title, and interest in any and all property, real or personal, involved in or traceable to the offense set forth in Count Three of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

    b.   A sum of money equal to the total value of the property described in subparagraph a above.

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

    a.   The business computers;

    b.   The money counters;

    c.   The nests of safety deposit boxes and keys;

    d.   The digital and video surveillance and security equipment; and

    e.   The biometric scanners

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section

15

5317(c)(1)(B), and Title 28, United States Code, Section 2461(c),
defendant USPV shall forfeit substitute property, up to the value of
the property described in paragraph 2 above if, as the result of any
act or omission of defendant USPV, the property described in
paragraph 2 above or any portion thereof (a) cannot be located upon
the exercise of due diligence; (b) has been transferred, sold to, or
deposited with a third party; (c) has been placed beyond the
jurisdiction of the court; (d) has been substantially diminished in
value; or (e) has been commingled with other property that cannot be
divided without difficulty.

A TRUE BILL

/S/

Foreperson

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

ANDREW BROWN
Assistant United States Attorney
Major Frauds Section

16